UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x
:
LANCE SPACEK,                              :
                                           :       **MEMORANDUM AND ORDER**
               Plaintiff,                  :
                                           :
       v.                                  :       04 Civ. 8149 (LBS)
                                           :
MARKETWATCH, INC., F/K/A                   :
MARKETWATCH.COM, INC.,                     :
                                           :
               Defendant.                  :
                                           :
------------------------------------------------x

SAND, District Judge.

      Lance Spacek, a financial analyst and advisor, worked for the investment company Salomon Smith Barney (SSB) from 1998 until November 2002. In March 2002, SSB entered into a contract with MarketWatch, a financial news and information website, to provide MarketWatch with investment advice with respect to four companies the company was considering for acquisition. Spacek was the principal liaison between SSB and MarketWatch, providing services that MarketWatch found more than satisfactory. When SSB laid Spacek off during an economic downturn in the digital media market, MarketWatch entered into a separate engagement with Spacek in order to keep him working on its transactions. This dispute arises out of the contract between Spacek and MarketWatch and raises the question of whether it allows Spacek to recover a fee for financial advice provided to MarketWatch. Both parties agree the contract is valid and

1

binding.[1] After an examination of the contract and upon hearing evidence presented at trial, it is the Court's decision that Spacek is entitled to his fee under the terms of the contract.

I.    FACTS

In March 2002 MarketWatch retained SSB as its financial advisor for four potential acquisitions. The contract entered into between MarketWatch and SSB stated that MarketWatch had chosen to engage SSB as its "exclusive financial adviser in connection with one or more possible Transaction(s) involving Bankrate Inc., Hoover's Inc., ScreamingMedia Inc. and/or EDGAR Online, Inc." Screaming Media was often referenced as "SAM," and would eventually come to be known as Pinnacor.[2] The agreement was structured as a "success fee." (Trial Tr. 83-84, Feb. 21-22, 2006) If no transaction was consummated, SSB would get nothing. If a transaction was consummated, a fee would be paid. The contract did not specify hours to be spent on any project by SSB. There was no floor or ceiling for the number of hours to be spent in analyzing, facilitating, or negotiating any of the four potential transactions.

If a transaction was consummated between MarketWatch and any of the four companies, SSB would be entitled to $1,000,000 as long as the transaction required an opinion letter. An opinion letter is an assessment of the fairness to the acquiring company of the proposed transaction. The assessment subjects the writer to potential liability if the fairness of the transaction is later challenged. If smaller transactions occurred which did not require the rendering of an opinion letter, the compensation was to be mutually determined by SSB and MarketWatch. SSB was obligated to perform "such financial advisory and investment banking services for the Company in connection with the proposed Transaction as are customary and

---

[1] Plaintiff presented a quantum meruit claim which is barred by the existence of a valid contract. See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005) ("New York law does not permit recovery in quantum meruit, however, if the parties have a valid, enforceable contract that governs the same subject matter as the quantum meruit claim."). Spacek did not claim to be owed a finder's fee or broker's fee.
[2] Screaming Media syndicated video content to website operators and also sold financial data to website operators.

2

appropriate in transactions of this type and as you reasonably request." The contract also contained a "tail" provision, which ensured that if MarketWatch's relationship with SSB terminated or expired SSB would still receive its fee if MarketWatch entered into a transaction with any of the four named companies within 12 months of the date of termination or expiration.

Spacek was the lead banker for SSB on the team working for MarketWatch, and he played a role in drafting the SSB-MarketWatch contract. He was the supervisor of the SSB team assigned to MarketWatch and he worked closely with MarketWatch in planning MarketWatch's financial strategy with respect to the four companies detailed in the agreement. Spacek was MarketWatch's primary contact at SSB; he spoke to MarketWatch officers and the board on a regular basis. Defendant's witnesses, Lawrence Kramer, former CEO and chairman of MarketWatch, and Joan Platt, former CFO of MarketWatch, held Spacek and his work in high regard while he worked for SSB.

While working for SSB, Spacek evaluated MarketWatch's four acquisition targets, including EDGAR Online and ScreamingMedia. He examined the value of these companies to MarketWatch and assessed whether acquiring them made strategic sense. He made presentations to Kramer and Platt which detailed his analysis of the respective companies. He evaluated the potential business combinations with all four targets and presented strategies for all four targets to Kramer and Platt. SSB and MarketWatch agreed to pursue the EDGAR transaction first, as it appeared to be the best fit and to be significantly undervalued. Spacek was the lead negotiator for MarketWatch and both Kramer and Platt were pleased with the services Spacek was providing.

In November of 2002 Spacek was laid off by SSB. Kramer testified that he was "stunned" upon learning the news. (Tr. 17.) Platt was also unhappy, stating that MarketWatch "felt that he had done a good job for us and we wanted him to continue doing that job." (Tr. 178.) The EDGAR negotiations were in full swing at the time and a deal with EDGAR appeared to be set for closing in a matter of months. Losing Spacek was perceived by MarketWatch to be a loss to it. Testimony by the MarketWatch officers confirmed that Spacek had done quality work for

3

MarketWatch and that MarketWatch did not want to lose him. Nor did Spacek want to abandon this client or this area of financial advisory services. As a result of this mutual desire to continue the professional relationship, a separate contract was drafted that would allow Spacek to continue working for MarketWatch on an independent basis.

CONTRACT DRAFTING

Spacek, working without the assistance of an attorney, drafted a new arrangement with Joan Platt. Platt testified that she could not recall specifically whether MarketWatch's attorneys looked at the contract before it was signed but said she would be surprised if they had not. (Tr. 163.) Regardless, all sides agree that no attorney assisted Spacek in the drafting and that MarketWatch had at best minimal assistance from attorneys. This is regrettable because clearer drafting might well have prevented this dispute from ever arising.

Instead of drafting a new contract from scratch, the parties used the SSB-MarketWatch contract as a template and formed the contractual language for the new Spacek-MarketWatch agreement by excising certain words from the template and substituting others. This was done, in Spacek's view, because he trusted that the SSB-MarketWatch contract had been reviewed by competent attorneys, and because by copying and excising sections he could avoid hiring an attorney himself. (Tr. 98-100.) MarketWatch was also content to use this process.

Spacek and Platt exchanged drafts of the new agreement and ultimately settled on a mutually agreeable version. Spacek wrote to Joan Platt that "[f]or simplicity, I have used the SSB engagement letter as the base and only modified it so that it reads correctly." (E-mail from Spacek to Platt, Dec. 10, 2002.) He had "delete[d] the relevant portions: right of first refusal on financing, research commitment, delivery of an Opinion, etc. I have used the fee construct that your counsel had sent to Harsha [of SSB], reversing the parties and the percentages." (Id.) Despite the fact that the SSB-MarketWatch contract was used as a template, SSB's relationship with MarketWatch is not mentioned in the Spacek-MarketWatch contract (except for an

accidental, leftover reference)[3]. The contract describes no role for SSB. The contract was back-dated to November 9, 2002 to cover the entire period Spacek worked independently for MarketWatch and was signed sometime after January 6, 2003.

Like the SSB-MarketWatch agreement, the Spacek-MarketWatch agreement was structured as a success fee. No matter how many or how few hours Spacek worked, there would be no payment unless a transaction with one of the four targeted companies was consummated. The contract established that for the first consummated transaction requiring an opinion letter, Spacek would be entitled to 20% of $1,000,000. For the next transaction, he would be entitled to 10% of $1,000,000. The next two transactions would each pay 5%. If the transaction did not require an opinion letter, Spacek's fee would be jointly determined by Spacek and MarketWatch. Like the original SSB-MarketWatch contract, no hours were specified, nor were any specific tasks detailed. Spacek was to render "financial advisory services for the Company in connection with the proposed Transaction as are customary and appropriate in transactions of this type and as [MarketWatch] reasonably request[ed]." Notably, Spacek's contract required him to render only "financial advisory services," not, as in the SSB contract, "financial advisory and investment banking services." Nor did the contract contain a termination date, unlike the SSB-MarketWatch contract which was to last 18 months. The contract did possess the same "tail" provision, which allowed Spacek to be paid his fees if a transaction was consummated within 12 months of the termination of his employment.[4]

In an agreement dated December 15, 2002, SSB and MarketWatch agreed to change their original agreement. They removed the language from the original contract which named SSB as the "exclusive" financial advisor for the four contemplated acquisitions. SSB would now be paid 80% of $1,000,000 for the first transaction, 90% for the next, and 95% for the final two

---

[3] In the "Miscellaneous" section, the agreement states it will be "binding upon and inure to the benefit of the Company and SSB and their respective successors and assigns." Both parties agreed this reference is accidental.
[4] The contract terms governing Spacek's tail provision are partially cut off in the copy provided the Court but MarketWatch has not contested this provision.

transactions. Spacek knew that SSB and MarketWatch were negotiating a deal which would allow him to remain as an advisor to MarketWatch. He had received an e-mail from Kramer stating that SSB had "confirmed the deal" in principle, (E-mail from Kramer to Spacek, Nov. 7, 2002), and that SSB would "carve out" his share of the money, essentially agreeing to charge MarketWatch less so that Spacek could charge his own fee without any greater cost to MarketWatch. (Id.) MarketWatch would pay a total of $1,000,000 for each transaction, as originally provided in the SSB-MarketWatch agreement. Only now, MarketWatch would pay SSB one part of the sum (80% for the first transaction) and Spacek another (20% for the first transaction). Just as the Spacek-MarketWatch contract did not describe a role for SSB or condition any payment on the participation of SSB, the amendment to the SSB-MarketWatch contract did not mention Spacek.

In January of 2003 the relationship between SSB and MarketWatch broke down. According to Kramer, SSB stopped providing research services to MarketWatch and it was MarketWatch's belief that the SSB-MarketWatch contract was only good as long as SSB was providing those services. Kramer testified that he assumed that the fact that the SSB-MarketWatch contract had ended meant that the Spacek-MarketWatch contract must terminate as well because Spacek's contract was "linked" to the SSB contract. (Tr. 25.) This conclusion Kramer apparently reached without regard to the language of the contract or consultation with counsel. He conceded that he could not recall asking counsel at any time prior to the commencement of litigation to review the pertinent documents to ascertain whether there was a continuing legal obligation to Spacek.

Kramer sent an e-mail to Spacek on January 24, 2003 in which he ruminated about the effects of SSB's action on the relationship between MarketWatch and Spacek. The e-mail, discussed in more detail below, did not explicitly end their relationship. The relationship subsequently faded out, never definitively terminating. While the Spacek-MarketWatch contract

6

required that Spacek be notified in writing that MarketWatch was terminating its agreement with Spacek, no written notification was ever sent.

The parties, however, take the date of the e-mail as the applicable date of termination for purposes of the contract and its "tail" provision. They agree that within one year of the e-mail exchange between Kramer and Spacek, MarketWatch acquired ScreamingMedia (now called Pinnacor) with the help and opinion letter of the investment company UBS.[5]

Pinnacor had rapidly become the prime acquisition target for MarketWatch. The EDGAR transaction had fallen through after MarketWatch sensed that EDGAR was holding back on signing several important contracts. Pinnacor stood out as one of the best acquisitions MarketWatch could make. Among other features, Pinnacor had a stock price charting service similar to that of MarketWatch. Acquiring Pinnacor would give MarketWatch access to Pinnacor's data services and customers, as well as allow MarketWatch to eliminate a significant competitor from the field. As EDGAR discussions stalled, MarketWatch focused more on Pinnacor. Between September and December 2000, MarketWatch with the help of Spacek began performing due diligence on Pinnacor, traveling to Pinnacor's offices to review documents. MarketWatch wanted to get past the publicly known information and determine if Pinnacor was the right fit. After additional weeks investigating and evaluating Pinnacor as a target, an agreement between MarketWatch and Pinnacor was announced in July 2003.

Spacek was in contact with Kramer soon after the Pinnacor agreement was announced. According to Spacek and Kramer, Spacek stated he was pleased the transaction had gone forward in that it was good for MarketWatch and it was good for him, implying that he was now due a sum of money. Kramer said that Platt would be in touch with Spacek about his compensation. When Platt got in touch with Spacek, a dispute arose over whether Spacek was in fact owed the

---

[5] Ironically, SSB, by that time known as "Citigroup Global Markets," served as investment advisor to Pinnacor and provided it with an opinion letter. For this reason the Court places little significance on the fact that SSB has not sought a fee from MarketWatch in relation to the Pinnacor transaction. After SSB became Pinnacor's advisor and was to receive a fee from it, MarketWatch became responsible for this fee pursuant to the terms of the acquisition agreement. (Tr. at 35-36, 43-45, 217-18.)

$200,000 he sought under the contract. Platt wrote to Spacek in an e-mail that MarketWatch wanted to continue working with him and offered $225 an hour for future services. "As to past services, we feel it is appropriate to pay for the time you incurred for us while you were on your own." (E-mail from Platt to Spacek, Aug. 26, 2003). MarketWatch offered Spacek $50,000 for past services, making a rough calculation of the number of hours he had worked for MarketWatch on other matters, specifically the EDGAR transaction. Spacek declined and this litigation ensued. MarketWatch was acquired by Dow Jones in January 2005.

THE PARTIES' CLAIMS

At trial, Plaintiff argued that he was entitled to a fee of $200,000 in light of both the work he had done on the Pinnacor deal and the fact that—because of the size of the transaction—the Pinnacor deal received a fairness opinion. He argued that his contract with MarketWatch did not require that SSB render the fairness opinion in order for him to be paid, as the contract did not specify the entity which would render the opinion, nor did it mention SSB (other than in error). Furthermore, Spacek argued that he had rendered the requested services necessary to be paid the $200,000, citing advice he provided on the Pinnacor deal and a December 2002 meeting he attended on MarketWatch's behalf with Kirk Loevner, CEO of Pinnacor. Spacek stated that he was instructed to discuss the potential Pinnacor transaction with Loevner and that when he submitted expenses to MarketWatch for this work he was reimbursed without objection.

Defendant argued—as it did in its unsuccessful motion for summary judgment—that Spacek was not entitled to a fee of $200,000 because such a fee was only possible in the event that "(i) a Transaction was consummated; (ii) a fairness opinion was rendered by SSB on the Transaction; and (iii) Plaintiff performed requested financial advisory services in connection with that Transaction." (Def.'s Supp. Mot. 1-2.) While the Pinnacor transaction had occurred within one year of Spacek's termination, Defendant argued that the requisite fairness opinion had never been rendered, and that even if such an opinion were somehow deemed unnecessary, Spacek had

not performed requested financial advisory services in connection with the transaction sufficient to merit a $200,000 fee.

II.	THE CONTRACT

TEXT

There is no question a transaction was consummated between MarketWatch and one of the companies mentioned in the Spacek-MarketWatch agreement. The question is thus two-fold: did the Spacek agreement require that SSB be the entity that rendered an opinion letter on behalf of MarketWatch, and did Spacek perform advisory services for MarketWatch "in connection with the proposed Transaction as are customary and appropriate in transactions of this type and as [MarketWatch] reasonably request[ed]"?

"It is a fundamental principle of contract interpretation that, in the absence of ambiguity, the intent of the parties must be determined from their final writing and no parol evidence or extrinsic evidence is admissible." Int'l Klafter Co. v. Cont'l Cas. Co., 869 F.2d 96, 100 (2d Cir. 1989). The text of the Spacek-MarketWatch contract states: "For my services hereunder, the Company will pay the percentage of the following Cash Fees with respect to each Transaction in accordance with the schedule below:

> (a) $1,000,000, payable promptly upon consummation of each Transaction, provided that in the event a Transaction does not require an Opinion, the Cash Fees payable to LS will be jointly determined by LS and the Company."

The Spacek-MarketWatch contract then notes that Spacek will receive 20% of $1,000,000 for the first transaction. Though the contract is silent on this point, there is no dispute that Spacek was under no obligation to provide an opinion letter. Opinion letters generally are furnished by well-capitalized finance entities, not by individuals. An opinion letter subjects the author to liability if the transaction is later challenged, and thus opinion letters generally are

9

written by investment companies with significant assets. Platt's testimony at trial confirmed this: "[F]rom what I understood, we would not ask him to deliver an opinion." (Tr. 187.) Both sides interpret the contract as requiring an entity aside from Spacek to provide it. The contract makes no mention, however, of who will undertake the responsibility for providing an opinion letter.

Defendant has not argued that based on the text of the contract alone the Spacek-MarketWatch contract specified the identity of the author of the opinion letter as SSB and SSB only. Rather, Defendant has argued that in light of the SSB-MarketWatch agreement, the Spacek-MarketWatch agreement should be interpreted in a certain way. Both parties agree that Spacek and MarketWatch copied portions of the text from the SSB-MarketWatch contract; they simply disagree as to the import of that copying. Regardless, the agreement did not explicitly condition Spacek's compensation on SSB's performance. MarketWatch may have been attracted to the idea of engaging both Spacek (as an independent advisor) and SSB without paying more than its original $1 million, but the fact remains that MarketWatch signed the Spacek agreement which had notable differences from the SSB letter (e.g. no research requirement and no requirement that Spacek himself write the opinion letter). The text of the Spacek engagement letter therefore does not support the conclusion that only SSB could provide the opinion. See Burger King Corp. v. Horn & Hardart Co., 893 F.2d 525, 527 (2d Cir. 1990) ("Contract language is ambiguous if it is reasonably susceptible of more than one interpretation, and a court makes this determination by reference to the contract alone.").

The contract refers to the opinion letter without specifying an author, e.g. "in the event a Transaction does not require an Opinion," and it is a fair argument that this phrasing alone does not create ambiguity sufficient to warrant the examination of parol evidence. See Reiss v. Fin. Performance Corp., 764 N.E. 2d 958, 961 (N.Y. 2001) ("[W]here a contingency has been omitted, we will not necessarily imply a term since courts may not by construction add or excise terms . . . and thereby make a new contract for the parties under the guise of interpreting the writing.") (quotations omitted). The Spacek-MarketWatch contract refers to a fairness opinion, but does not

refer to whether a specific entity must render it.  Nevertheless, if this case involved whether Spacek himself was required to render the letter, which is a plausible interpretation of the contract based on the terms alone, the Court would readily examine the parol evidence.  See Schering Corp. v. Home Ins. Co., 712 F.2d 4, 9 (2d Cir. 1983) (contract ambiguous where "contract language is susceptible of at least two fairly reasonable meanings").  The Court will therefore do so in this case and concludes that the result is the same with or without the parol evidence.

PAROL EVIDENCE

The Court heard from three witnesses over the course of a two-day trial: Kramer, Platt, and Spacek.  The Court found Spacek and Platt to be entirely credible.  The Court found Kramer credible for the most part though it gave less weight to his recollection of events surrounding certain disputed instructions given to Spacek regarding the meeting with the CEO of Pinnacor (discussed below).

At trial, it became clear that even though Spacek and MarketWatch were bargaining in the shadow of the SSB-MarketWatch agreement, the terms of the Spacek-MarketWatch contract embrace situations beyond the three immediate actors (SSB, Spacek, and MarketWatch).  It is not apparent that Spacek and MarketWatch took into consideration the identity of the provider of the opinion letters during the drafting of the agreement.  Thus the agreement did not make explicit what if any impact a change in the SSB-MarketWatch relationship would have on Spacek.  The relevant portions of the two agreements highlight the impact of certain changes made in the drafting process.

The SSB-MarketWatch contract states that SSB is shall be entitled to:

    (a)    an Opinion fee of $1,000,000, payable promptly upon consummation of a Transaction (provided that in the event a Transaction does not require an Opinion, the cash fees payable to SSB will be jointly determined by SSB and the Company); plus . . .

The Spacek-MarketWatch contract states that Spacek shall be entitled to 20% of:

(a)  $1,000,000, payable promptly upon consummation of each Transaction, provided that in the event a Transaction does not require an Opinion, the Cash Fees payable to LS will be jointly determined by LS and the Company; plus . . .

The first observation is that Spacek removed the words "Opinion fee" from section (a). His testimony was that he did so because he would not be rendering an opinion letter himself because the liability was too great. "I was an individual, not at a large firm, with limited resources. I wasn't going to put myself in that position, so I removed the opinion letter language." (Tr. 112.) Thus, Spacek immediately put some distance between himself and the more general obligation to render the letter. The fee itself was no longer called an "Opinion fee," it was just a percent of $1,000,000.[6]

The next key item is the fact that in the SSB letter there is an obvious connection between who will author the opinion letter and who will receive the opinion fee. The SSB contract states that SSB will get an opinion fee of $1,000,000 unless an opinion is not needed. There is no suggestion that SSB could retain the fee if it did work on a case but some other entity rendered the opinion; that construction makes no sense given SSB's contractual relationship as MarketWatch's exclusive financial advisor (a status that would change after Spacek was laid off by SSB and MarketWatch sought to retain him).

That construction (allowing any entity to render the opinion letter) does make sense, however, for Spacek, who was not receiving an opinion fee at all, but was receiving a portion of $1,000,000 in exchange for his advisory services. His contract was limited to providing "financial advisory services," whereas the SSB-MarketWatch contract required SSB to provide "financial advisory and investment banking services." Spacek's advisory services were entirely

---

[6] There is similar language in the amendment to the SSB-MarketWatch contract but MarketWatch did not contest Spacek's statement that he made the alteration on his own in the drafting of the Spacek-MarketWatch agreement.

separate from any obligation to render an opinion.  Spacek need not have rendered an opinion to obtain his fee and it mattered little to Spacek who rendered the opinion, as long as it allowed the transaction to occur which triggered his percentage of $1,000,000.  Moreover, the references to a fairness opinion in both the SSB-MarketWatch and Spacek-MarketWatch contracts appear to represent a type of shorthand for distinguishing large and small transactions.  The requirement of a fairness opinion operates as a broad generality for distinguishing two kinds of deals, not as the more specific implication that SSB—and only SSB—must render the letter for Spacek to be paid for his services.

Another important fact is revealed in an e-mail exchange between Spacek and Platt which occurred during the drafting.  After Spacek wrote to inform Platt that he had "used the SSB engagement letter as the base and only modified it so that it reads correctly . . . and to delete the relevant portions," (E-mail from Spacek to Platt, Dec. 10, 2002), Platt replied in a January 6, 2003 e-mail.  She directed him to examine her "attached changes" (which were never provided to the Court).  She also stated: "The term of the agreement is 10 months to match SSB's and a clarification of wording on page 3 (as so indicated on the SSB letter).  If you are comfortable, then let me know how you want to process it." (E-mail from Platt to Spacek, Jan. 6, 2003.) Whether Spacek was comfortable or not, the ten month period was not included in the contract. Whereas SSB's contract had a stated term of engagement of 18 months, Spacek's had no parallel term.

In addition to the changes made in the drafting of the Spacek-MarketWatch contract, it became evident at trial that there was no love lost between Spacek and SSB after his firing.[7] Though he recognized that SSB would have to bend in order for him to maintain a working relationship with MarketWatch given SSB's exclusive arrangement, Spacek was striking out on his own to forge an independent relationship with MarketWatch.  A certain distaste for SSB was

---

[7] A further irony with respect to the tangled relationship among the parties is the fact that Spacek is presently employed by SSB (now Citigroup) and has been so employed since April 2004.

maintained and the drafting does not reflect an intent by either Spacek or MarketWatch to give SSB the benefit of the doubt in any circumstances. When asked about SSB, Spacek stated that SSB was "the firm that had laid me off on November 4th. I absolutely would not have intended my contract to be linked in any way to theirs. The similarities are solely out of my effort to minimize legal expense to myself and to minimize approval process on the side of MarketWatch." (Tr. 159.) The Court found this statement credible.

Weighing in Defendant's favor is the fact that both sides bargained in the shadow of the SSB-MarketWatch relationship and literally copied from that contract. It is also clear that Spacek would not have been able to work for MarketWatch had SSB not agreed to yield its status as MarketWatch's exclusive financial advisor. Moreover, Spacek's compensation was to mirror the SSB compensation, allowing MarketWatch to pay no more than the original $1,000,000 for any completed transaction. But whether or not Spacek was able to enter into an agreement with MarketWatch because SSB and MarketWatch negotiated down their own agreement, SSB is not a signatory to Spacek's contract. He used SSB's letter for content, but SSB had no active participation in forming his contract with MarketWatch. SSB's only implicit recognition of Spacek was in lowering its fee and in abandoning the language in its own original contract with MarketWatch that mandated an exclusive relationship. With that language gone, any other entity could have provided an opinion letter, in which case (as in this case) Spacek would be entitled to his fee.

The notion that copying portions of the letter made Spacek's compensation contingent on SSB's participation, and SSB's participation alone, is an interpretation of the contract the Court does not find valid. That interpretation finds insufficient support both in the contract text and the evidence heard at trial. The better interpretation is that after being laid off by SSB, Spacek managed to preserve a place for himself at MarketWatch's side and to secure for himself a pay package that compensated him handsomely for his advisory services in transactions warranting an opinion letter and somewhat less handsomely in those that did not. The contract terms embrace

14

the scenario that opinion letters may be authored by entities other than SSB, and the parol evidence heard at trial did not vary that understanding.

SERVICES

Even if Spacek's contract is not linked to SSB's, Spacek must still show that he performed work "customary and appropriate in transactions of this type and as [MarketWatch] reasonably request[ed]." Defendant challenges this point, arguing that Spacek's involvement on the Pinnacor transaction was insignificant and unrequested.

As an independent advisor to MarketWatch, Spacek unquestionably spent more of his time on the ultimately unsuccessful EDGAR Online transaction than the Pinnacor transaction. But Spacek's advice and involvement with the Pinnacor deal were significant, and as the testimony showed, they were the type of efforts MarketWatch expected to receive. With regard to Pinnacor, Spacek points to a lunch meeting he had with Pinnacor CEO Kirk Loevner in December of 2002, and to his e-mail exchange with Kramer in January of 2003. Spacek had a meeting with Loevner at which he claims to have discussed a deal between MarketWatch and Pinnacor. Spacek contended at trial that this lunch was a "customary service" and requested by MarketWatch, citing the fact that MarketWatch had empowered him to work on all four transactions and that Kramer had specifically asked him to meet with Loevner. According to Spacek, "Kirk Loevner and I sat down and I delivered the message that Larry Kramer had instructed me to deliver, which was our intent and desire to acquire them." (Tr. 108.) Loevner's response was that Pinnacor had an interest in combining with MarketWatch, a piece of information not known to the public. Notably, Spacek took the receipt for the lunch meeting and submitted it to MarketWatch on an expense sheet, noting "Lunch with Sam CEO, Kirk Loevner."[8] Spacek was reimbursed for the expense shortly thereafter.

---

[8] Defendant claims that the absence of notes from this meeting and the absence of documents reflecting hours worked on the Pinnacor deal in general demonstrate that Spacek did no work on the transaction. This

15

At trial, MarketWatch argued that neither Kramer nor Platt instructed Spacek to meet with Loevner. Platt asserted that the receipt was meaningless because it was on a sheet of expenses which collectively did not reach a monetary amount which required her signature. MarketWatch also argued that the lunch meeting itself was not a "customary service" worthy of a $200,000 fee. But Platt conceded at trial that the Loevner lunch could not be for the purposes of consummating a transaction with EDGAR Online, it had to be for a Pinnacor-MarketWatch transaction. (Tr. 215.) Furthermore, business lunches such as this one are customary services for which an advisor would be compensated. When Platt was asked "if Mr. Spacek had meetings with Pinnacor executives regarding a possible merger or acquisition with MarketWatch, would those be the types of services you would expect from an investment banker?" the answer was "Yes." (Tr. 212.) Platt later stated that she believed that customary financial advisory service "entails a lot of hours. You're talking about hundreds and hundreds of hours, up to thousands done by the investment banking firm." (Tr. 219.) The contract simply does not reflect that understanding. Again, the absence of attorney participation in the contract drafting is unfortunate. Platt's beliefs about what Spacek would have had to do to obtain the success fee are not reflected in the terms of the contract. Platt may have expected Spacek to perform some set of hours, but this success fee contract contains no floor or ceiling for hours worked, nor can one be implied from the term "customary services." Indeed, Platt conceded that a meeting with Loevner was a customary financial advisory service.

Kramer also implicitly conceded that the advice Spacek provided amounted to customary financial services. Kramer was asked, "If Mr. Spacek had telephone conversations with you about issues related to Pinnacor, would those be the services that you would expect from an investment banker in connection with his agreement?" He responded that it would depend on the content, but "sure, advice is one of the things you would like to get, you do get from investment

---

is incorrect, as the parties agreed to a success fee contract that provided compensation not for a set number of hours but only if a transaction was consummated.

bankers." Kramer was then asked, "If he discussed things involving valuation?" Kramer's response: "Sure." (Tr. 63.) Spacek gave uncontradicted testimony that he spoke with Kramer "virtually daily" when he was working independently for MarketWatch. (Tr. 104). These discussions were in part about EDGAR and in part about Pinnacor. As Spacek testified, "it was important to keep Pinnacor/Screaming Media warm, if you will, so that if the transaction with EDGAR didn't occur, we could acquire Screaming Media instead, or if it did occur, we could still acquire Screaming Media subsequent to that." (Tr. 105.) MarketWatch never challenged this testimony and the Court found it credible.

Spacek, an individual advisor and not an investment banking firm, rendered customary financial services in meeting with Loevner and in providing financial advice on Pinnacor. The only question is whether services were "requested" by MarketWatch. On cross-examination, Kramer stated that he simply could not recall if he had instructed Spacek to meet with Loevner. "Isn't it true, Mr. Kramer, that you asked Mr. Spacek to have lunch with Kirk Loevner in order to express to Pinnacor MarketWatch's continued or wanting to continue in some type of deal?" Answer: "I don't remember that. I'm sorry. I just don't remember." (Tr. 58.) During Kramer's direct testimony he was asked, "After his termination from Salomon Smith Barney, what, if anything, did you ask Spacek to do on a potential Pinnacor deal?" The answer: "We asked him if he would be interested in working on it, and nothing happened." (Tr. 23-24.) The statement "nothing happened" was not explored but certainly the lunch with Kirk Loevner did happen and a deal with Pinnacor was ultimately consummated. The January 24, 2003 e-mail exchange between Spacek and Kramer casts doubt on the assertion that Spacek's work on the Pinnacor deal was unrequested. Spacek detailed his thoughts on both EDGAR and Pinnacor in the e-mail, and Kramer responded with his own thoughts. The note was "very helpful," Kramer wrote, and he wrote to Spacek that he found it "hard to argue with your assessments." (E-mail from Kramer to Spacek, Jan. 24, 2003.) Kramer described his thinking on EDGAR and Pinnacor, telling Spacek "I'm supposed to be meeting with Kirk Loevner in a few minutes, so I'll know more about the

17

PCOR issues shortly." (Id.) This exchange does not reflect the actions of a financial advisor gratuitously insinuating himself into negotiations; Spacek's advice is accepted and his role in offering advice on Pinnacor unquestioned.

At trial, Kramer attempted without success to cast this exchange in a different light: "I thought [Spacek's] assessments were based on public record or on knowledge that we already had. I mean, a lot of people can send me e-mails about potential targets, but I don't consider it financial advice." (Tr. 64.) He also stated that "[e]very bank that came to us to ask us to represent us in negotiations for Pinnacor provided similar data when they requested the commission." (Tr. 64-65.) The crucial difference, of course, is that unlike those banks, Spacek already had a binding contract with MarketWatch that named Pinnacor as a target. The facts presented at trial and the credible testimony of Spacek indicate to the Court that Spacek was requested to meet with Loevner and to continue evaluating the Pinnacor deal. The testimony does not support the contention that Spacek's work on the Pinnacor transaction was not pursuant to his contract with MarketWatch.

III.  CONCLUSION

A transaction between MarketWatch and Pinnacor was consummated within one year of the effective termination of Spacek's contract. Consistent with his contractual obligations, Spacek provided customary, requested services on a transaction. This transaction required an opinion letter. Under the terms of his contract, Spacek is entitled to the fee of $200,000. Pursuant to N.Y. C.P.L.R. §§ 5001, 5004, prejudgment interest shall be awarded in the amount of nine percent per annum, with January 20, 2004 the date from which interest is to be computed. The quantum meruit claim is dismissed.

SO ORDERED

Dated: March 13, 2006
New York, NY

_____
U.S.D.J.